UNITED STATES of America, Appellee,

v.

Nancy REED and Morris Goldsmith, a/k/a "Marlowe," Defendants-Appellants.

Nos. 486, 487, Dockets 77–1319, 77–1320.

United States Court of Appeals, Second Circuit.

Argued Dec. 12, 1977.

Decided April 11, 1978.

Richard A. Greenberg, New York City (Robert S. Markfield, New York City, of counsel), for appellant Reed.

Helena Pichel Solleder, New York City, for appellant Goldsmith.

Minna Schrag, Asst. U. S. Atty., S. D. N. Y. (Robert B. Fiske, Jr., U. S. Atty., Robert B. Mazur, Audrey Strauss, Asst. U. S. Attys., S. D. N. Y., New York City, of counsel), for the United States.

Before FEINBERG and MESKILL, Circuit Judges, and BARTELS,* District Judge.

MESKILL, Circuit Judge:

This case involves the important and oft-reserved question whether and under what circumstances federal law enforcement officers may enter the home of a suspect in order to effect a felony arrest for which they have statutory authority and probable cause but no warrant. After a six-day jury trial in the United States District Court for the Southern District of New York, Frederick van Pelt Bryan, *Judge,* Nancy Reed and Morris Goldsmith were convicted of one count of conspiracy to distribute heroin and another count of distributing heroin. 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A) & (B), 846. Reed was sentenced to two concurrent six-year terms of imprisonment. Her sentence was suspended, however, and she was placed on probation for five years. Goldsmith was sentenced to two concurrent four-year terms of imprisonment and three years of special parole. For the reasons that follow, we reverse Reed's conviction and remand for a new trial but affirm Goldsmith's conviction.

The government proved that on three separate occasions Reed and Goldsmith were involved in the sale of heroin to Garfield Hammonds, Jr., an undercover agent employed by the United States Drug En-

* Hon. John R. Bartels, of the Eastern District of New York, sitting by designation.

forcement Administration ("DEA"), and that they negotiated with Hammonds for an additional purchase. Hammonds had been introduced to Reed and Goldsmith as "G.G." by a paid confidential informant named Adelious McCray.

Because McCray disappeared shortly before trial,[1] the government's case was based largely on testimony by Hammonds and fellow DEA Agents Richard Bell, Dwight Rabb, and Harvey Tuerack. According to their testimony, Hammonds, with the assistance of McCray, purchased one-eighth kilogram quantities of heroin from Reed and Goldsmith on the 9th, 23rd, and 29th of September, 1976, for $6,500, $6,300, and $6,500 respectively. When at one point Hammonds complained about the quality of the heroin, Reed told him that she had a "connection" in New Jersey named Paul Levy who was a reliable source of good heroin, that she had introduced her cousin "P.T." to Levy for purposes of making a two-kilogram purchase, and that she could arrange a similar transaction for Hammonds. During the two months that followed the third sale, Hammonds negotiated with Reed regarding the purchase of a kilogram of heroin for $100,000. When Hammonds vacillated, Reed told him that she had a source named James Crowley who could arrange the purchase of a pound of lesser-quality heroin for $36,000. On December 6, she produced a sample of the heroin that she said would come from Crowley. The transaction was never completed.

More than two and one-half months later, on the morning of February 23, 1977, Reed and Goldsmith were arrested in Reed's apartment in the Bronx by DEA Agents Bell, Tuerack and Ronald Jordison. The agents had neither arrest warrants nor a search warrant. While in the apartment, Agent Bell seized two personal telephone or address books belonging to Reed, copies of which were introduced by the government at trial. Because the arrest and the result-ing seizure of the books are critical to deciding Reed's appeal, we will examine them in detail.

At approximately 7:30 a. m., Agents Bell, Tuerack, Jordison and Aponte met near Reed's apartment house. At about 7:45 a. m., Agents Bell, Tuerack and Jordison entered the apartment building and proceeded to Reed's apartment on the fourteenth floor; Agent Aponte waited below. Agent Bell testified as follows:

> We went up to the 14th floor, and we knocked on the door of the apartment, and identified ourselves as agents of the United States Government.
>
> \* \* \* \* \* \*
>
> When I identified ourselves as agents of the Federal Government Drug Enforcement Administration, we were admitted to the apartment. Ms. Reed opened the door, I believe, and we told her that we had—we were arresting her and Mr. Goldsmith. Mr. Goldsmith was in the bedroom. He was in bed—I didn't see this, I did not arrest Mr. Goldsmith.
>
> \* \* \* \* \* \*
>
> Ms. Reed was in the living room or the dining area and with a tall female child [subsequently] identified as Ms. Reed's daughter. We explained to her who we were again. I placed Ms. Reed under arrest, and at that time I gave her her rights . . . . .

Reed, on the other hand, gave the following account:

> My daughter went to the door first, and they announced themselves as being police, so I came to the door and I opened the door. They rushed in, two ran immediately to the bedroom. Bell ran into my kitchen, came out of my kitchen with the phone books which he had taken out of my drawer and then he told me—he started reading the rights or whatever, and he told me I was under arrest, but that was all after he came into the apartment.

---

1. McCray called the DEA, apparently from places unknown, on the day that the jury began its deliberations.

When Reed pulled open the door she was dressed in a negligee and Goldsmith was asleep in the bedroom. Agent Bell testified that his gun was not drawn but that he was "not absolutely sure" whether the other agents had drawn their guns. Agent Tuerack said, "I had my hand on my weapon as I went through the door" and that his gun "may have been" visible to Reed as she stood at the door. Tuerack could not say whether Bell or Jordison had their guns drawn. The district court's version of Reed's arrest was: "She came to the door and they arrested her. Then they went into the apartment," and "she was arrested in full view when she opened the door."

Agent Tuerack testified as follows regarding the Goldsmith arrest:

We rang the bell and Nancy Reed came to the door. Agent Bell arrested her. Agent Jordison and myself went into the bedroom where we found Morris Goldsmith asleep.

\* \* \* \* \* \*

I woke him up and I told him he was under arrest for violation of federal narcotics laws.

\* \* \* \* \* \*

I stopped at the door [of the apartment] for about five or six seconds [and then] went right into the bedroom.

At the pre-trial hearing, Goldsmith testified that, after coming home at 5:00 a. m. in a "really intoxicated" condition, he went to sleep.

The next thing I know two—well, when I woke up there was two guns on both sides of my head with the federal officer explaining to me that he was an agent and that I was under arrest.

Agent Jordison then advised Goldsmith of his constitutional rights.

There is also disagreement regarding Agent Bell's seizure of Reed's telephone and address books. Bell testified that, while in the living room-dining room section of the apartment, the following took place:

I observed—I turned around and on a telephone table was an open address book. I looked down at the book and recognized one of the names in the book, one of the nicknames, one of the aliases in the book, and I asked Ms. Reed was this her telephone book. She said yes.

I said, "Well, I am going to take it," and she said, "Take it." And I removed the two telephone books from the telephone stand and brought them down to the New York regional office . . . ..

\* \* \* \* \* \*

I expected that the phone books when I looked at them were evidence.

Although the precise sequence is unclear, Bell's testimony during the trial indicates that he first saw the books without noticing any names, then read Reed her rights, and then looked more carefully at the books and discovered the names of alleged narcotics traffickers. Bell testified further that the books were next to the telephone on a small telephone table along the wall in the living room-dining room area, and that the name that caught his attention was that of one "Soda Pop," apparently the alias of a well-known narcotics trafficker in New York.

Reed's version is different. She claimed that Bell went into the kitchen and took one of the books from the kitchen drawer and another from her pocketbook, both prior to the time that he advised her of her rights.

The story of the seizure is complicated by the testimony of Thelma Routh, Goldsmith's mother. She testified that on the day of the arrest there was no telephone or telephone table in the living room-dining room area of the apartment; rather, she said, there was a wall phone in the kitchen under which there was no table. The sequence is further complicated by the fact that, although at one point Agent Bell said he had not gone into any part of the apartment other than the living room-dining room area, at another point he said he went into the kitchen during the initial efforts to secure the apartment.

After the arrests, Agent Bell took Reed to the DEA office in New York and Agents Tuerack and Jordison took Goldsmith. Bell again advised Reed of her constitutional rights. She denied any involvement what-

soever in narcotics until Agent Hammonds, "G.G.," entered the room in which she was being questioned. At that point she admitted she had participated in the sales. She was then taken to the United States Attorney's office, where she was interviewed and again advised of her rights, after which she signed a written statement. The same pattern of events took place with Goldsmith. He denied being involved in narcotics until he was confronted by Hammonds, at which point he too admitted participating in the sales. He was brought to the United States Attorney's office, advised of his rights and interviewed; he then signed a written statement. Agents Hammonds and Tuerack testified at trial regarding Reed's and Goldsmith's oral statements; the signed statements were admitted into evidence.

## DISCUSSION

### Reed's Fourth Amendment Claim [2]

The Fourth Amendment to the United States Constitution provides as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Reed argues on this appeal that her arrest was unconstitutional under the Fourth Amendment, that the seizure of her personal telephone books was therefore unlawful, that the introduction of those books at trial was neither proper nor harmless beyond a reasonable doubt and, accordingly, that her conviction should be reversed and her case remanded for a new trial. The question thus presented is whether and under what circumstances the Fourth Amendment permits federal law enforcement officers to enter a suspect's home in order to effect a felony arrest for which the officers have both statutory authority [3] and probable

[2]. Although Reed failed to move prior to trial to suppress the telephone books, as is customarily required by Fed.R.Crim.P. 12(f), the district court determined that Reed had not waived the objection and considered the matter when it was raised during trial. The district court based its decision on the prosecutor's failure to disclose to Reed his intention to introduce at trial photocopies of the books, as required by Fed.R.Crim.P. 12(d), and his violation of an oral understanding that all evidence discoverable under Fed.R.Crim.P. 16 would be turned over to Reed. The district court was "distressed" by this failure, and decided to rule on the merits of Reed's suppression motion. The district court declined to suppress the evidence, basing its decision on 21 U.S.C. § 878; *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976); *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), and the "plain view" doctrine. We too reach the merits of Reed's claim. *See* Fed.R. Crim.P. 12(f) ("the court for cause shown may grant relief from the waiver."); 8 Moore's Federal Practice ⸲ 12.03[3] (2d ed. 1977).

Goldsmith, on the other hand, attempts to argue for the first time on appeal that his post-arrest statements should have been suppressed because of the unlawfulness of his arrest. He clearly waived this objection, first by not raising it before trial and second by not even raising it during the trial, specifically declining on a number of occasions to associate himself with Reed's efforts to gain suppression

of the books. Accordingly, at least with regard to this issue, we do not reach the merits of his claim. Fed.R.Crim.P. 12(b)(3) & 12(f).

[3]. The Comprehensive Drug Abuse Prevention and Control Act of 1970, *as amended,* 21 U.S.C. § 801 *et seq.*, grants to DEA agents the following enforcement powers:

Any officer or employee of the Bureau of Narcotics and Dangerous Drug designated by the Attorney General may—

(1) carry firearms;

(2) execute and serve search warrants, arrest warrants, administrative inspection warrants, subpenas, and summonses issued under the authority of the United States;

(3) make arrests without warrant (A) for any offense against the United States committed in his presence, or (B) for any felony, cognizable under the laws of the United States, if he has probable ·cause to believe that the person to be arrested has committed or is committing a felony;

(4) make seizures of property pursuant to the provisions of this subchapter; and

(5) perform such other law enforcement duties as the Attorney General may designate.

21 U.S.C. § 878. *Compare* 18 U.S.C. § 3052 (F.B.I. agents); 18 U.S.C. § 3053 (U.S. Marshals); 18 U.S.C. § 3056(a) (Secret Service); 18 U.S.C. § 3061 (Postal Service inspectors); 26 U.S.C. § 7607 (Customs officers). The validity of the arrest here is to be determined by federal

cause[4] but no warrant. Surprisingly, neither the Supreme Court nor the Second Circuit has squarely decided this issue. We hold that warrantless felony arrests by federal agents effected in the suspect's home, in the absence of exigent circumstances, even when based upon statutory authority and probable cause, are unconstitutional. Because Reed's was such an arrest, and because we do not believe beyond a reasonable doubt that the introduction of the telephone books, seized at the time of the arrest, was harmless error, we reverse her conviction and remand to the district court for a new trial.

Although the Supreme Court has expressly reserved this issue on a number of occasions,[5] the Court has offered important signals as to how it ought to be handled. In *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), Justice Stewart, writing for the majority, noted that the Court had generally chosen to assume the validity of arrests and decide cases on grounds other than "the more fundamental question of when the police may arrest a man in his house without a warrant." 403 U.S. at 476, 91 S.Ct. at 2043. He also noted that a police entry into a home to effect an arrest is a "very substantial intrusion." 403 U.S. at 477, 91 S.Ct. 2022.

It is clear, then, that the notion that the warrantless entry of a man's house in order to arrest him on probable cause is

*per se* legitimate is in fundamental conflict with the basic principle of Fourth Amendment law that searches and seizures inside a man's house without warrant are *per se* unreasonable in the absence of some one of a number of well defined "exigent circumstances." . .

. . . . .

If we were to accept Mr. Justice White's view that warrantless entry for purposes of arrest . . . [is] *per se* reasonable, so long as the police have probable cause, it would be difficult to see the basis for distinguishing searches of houses and seizures of effects. . . .

. . . If we were to agree with Mr. Justice White that the police may, whenever they have probable cause, make a warrantless entry for the purpose of making an arrest . . . then by the same logic *any* search or seizure could be carried out without a warrant, and we would simply have read the Fourth Amendment out of the Constitution.

403 U.S. at 477–80, 91 S.Ct. at 2045. The Court also noted that the case of *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), in which the "hot pursuit" justification for entry into a home without a warrant was developed, "certainly stands by negative implication for the proposition that an arrest warrant is required in the absence of exigent circumstances." 403 U.S. at 481, 91 S.Ct. at 2045.[6]

standards. *See United States v. Jarvis,* 560 F.2d 494, 498 n.5 (2d Cir. 1977), *cert. denied,* —— U.S. ——, 98 S.Ct. 1511, 55 L.Ed.2d 532, 46 U.S.L.W. 3585 (U.S. Mar. 20, 1978). The central question presented by this case, of course, is not whether the agents had statutory authority to make probable cause arrests, nor is it whether the *method* of entry into Reed's apartment was within the agents' statutory powers; rather, the question is the constitutionality of the entry itself. *Compare Sabbath v. United States,* 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968); *Ker v. California,* 374 U.S. 23, 37–41, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) (plurality); *Wong Sun v. United States,* 371 U.S. 471, 482–84, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Miller v. United States,* 357 U.S. 301, 305–06, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958).

4. The parties do not dispute the existence of probable cause to make the arrests.

5. *See United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976); *id.* at 45 (Marshall, *J.,* dissenting); *United States v. Watson,* 423 U.S. 411, 418 n.6, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *Gerstein v. Pugh,* 420 U.S. 103, 113 n.13, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *Coolidge v. New Hampshire,* 403 U.S. 443, 481, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Jones v. United States,* 357 U.S. 493, 499–500, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958).

6. The Court referred to *Dorman v. United States,* 140 U.S.App.D.C. 313, 435 F.2d 385 (1970) (*en banc*), as having reached the "same conclusion." As discussed in the text, *Dorman* stands for the proposition that a warrantless arrest of a suspect in the home is unconstitutional in the absence of exigent circumstances. *See also* the colloquy during the oral argument of *Johnson v. Louisiana,* 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972), following the sug-

In *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), Justice White, writing for the majority, discussed the requirement of an arrest warrant with regard to an arrest effected in a public restaurant. The Court reserved the question "whether and under what circumstances an officer may enter a suspect's home to make a warrantless arrest," 423 U.S. at 418 n.6, 96 S.Ct. at 825 n.6, and held as follows:

Law enforcement officers may find it wise to seek arrest warrants where practicable to do so, and their judgments about probable cause may be more readily accepted where backed by a warrant issued by a magistrate. . . . But we decline to transform this judicial preference into a constitutional rule when the judgment of the Nation and Congress has for so long been to authorize warrantless public arrests on probable cause.

423 U.S. at 423, 96 S.Ct. at 828. (citations omitted). Justice Powell concurred, noting that the decision was "the first square holding that the Fourth Amendment permits a duly authorized law enforcement officer to make a warrantless arrest in a public place even though he had adequate opportunity to procure a warrant after developing probable cause for arrest." 423 U.S. at 427, 96 S.Ct. at 829. He also argued that the decision created "a certain anomaly":

Since the Fourth Amendment speaks equally to both searches and seizures, and since an arrest, the taking hold of one's person, is quintessentially a seizure, it would seem that the constitutional provision should impose the same limitations upon arrests that it does upon searches. Indeed, as an abstract matter an argument can be made that the restrictions upon arrest perhaps should be greater. A search may cause only annoyance and temporary inconvenience to the law-abiding citizen, assuming more serious dimension only when it turns up evidence of criminality. An arrest, however, is a serious personal intrusion regardless of whether the person seized is guilty or innocent. . . . Logic therefore would seem to dictate that arrests be subject to the warrant requirement at least to the same extent as searches.

423 U.S. at 427, 428–29, 96 S.Ct. at 830. (citations omitted). In view of "[t]he historical momentum for acceptance of warrantless arrests," however, he concluded that "a declaration at this late date that warrantless felony arrests are constitutionally infirm would have to rest upon reasons more substantial than a desire to harmonize the rules for arrest with those governing searches." 423 U.S. at 430, 96 S.Ct. at 831. Justice Marshall, joined by Justice Brennan, dissented, believing that, "by the reference to the seizure of persons, the Fourth Amendment was intended to apply to arrests," 423 U.S. at 436–37, 96 S.Ct. at 834, and that the Court had improperly hinged its decision not on whether the circumstances of the arrest fit into certain exceptions to the warrant requirement of the Fourth Amendment but on whether the arrest had been "reasonable." 423 U.S. at 444–45, 96 S.Ct. at 838. Accordingly, he believed that "the proper result is application of the warrant requirement, as it has developed in the search context, to all arrests." 423 U.S. at 453, 96 S.Ct. at 842.

The most recent Supreme Court case to broach this issue is *United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406 (1976). There, Philadelphia narcotics officers received information that Santana possessed marked money that had been used in a narcotics purchase arranged by an undercover agent.

gestion by the attorney for the state that it would be unreasonable to require the police to obtain a warrant:

Mr. Justice Stewart: "Are you familiar with this Court's case in *Warden v. Hayden*?"

Mrs. Korns: "Yes, your Honor, I am."

Mr. Justice Stewart: "Well, why do you think this Court spent so long in carving out an exception if there was no general rule that you cannot enter a house without a warrant?"

*quoted in* Y. Kamisar, W. LaFave & J. Israel, Modern Criminal Procedure, 311–12 n.1 (4th ed. 1974).

The officers drove to Santana's residence and saw her "standing in the doorway of the house." 427 U.S. at 40, 96 S.Ct. at 2408 (footnote omitted). One officer testified that "one step forward would have put her outside, one step backward would have put her in the vestibule of her residence." 427 U.S. at 40 n.1, 96 S.Ct. at 2408. The officers got out, shouted "police," displayed their identification and approached her. She retreated into the house and the officers pursued her, catching her in the vestibule. Justice Rehnquist, writing for the majority, determined that the case presented the same issue that had already been resolved in *Watson,* namely, the validity of a warrantless public arrest:

> While it may be true that under the common law of property the threshold of one's dwelling is "private," as is the yard surrounding the house, it is nonetheless clear that under the cases interpreting the Fourth Amendment Santana was in a "public" place. She was not in an area where she had any expectation of privacy. "What a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection." . . . She was not merely visible to the public but was as exposed to public view, speech, hearing and touch as if she had been standing completely outside her house. . . . Thus, when the police, who concededly had probable cause to do so, sought to arrest her, they merely intended to perform a function which we have approved in *Watson.*

427 U.S. at 42, 96 S.Ct. at 2409. (citations omitted).

Justice White concurred, believing that there was probable cause to arrest Santana and to believe that she was in the house and, accordingly, that "a warrant was not required to enter the house to make the arrest, at least where entry by force was not required." 427 U.S. at 43–44, 96 S.Ct. at 2410. Justice Stevens, joined by Justice Stewart, concurred, believing that the officers had "sufficient information to obtain a warrant for the arrest of Santana in her home," that the failure to obtain a warrant was justifiable because of the "significant risk" that Santana could have disposed of the money before a warrant could have been obtained and that, in any event, even if the police action was not justifiable it was harmless because Santana had "ventured into plain view." 427 U.S. at 44–45, 96 S.Ct. 2406. Justice Marshall, joined by Justice Brennan, dissented, noting that, although the Court seemed to be combining the plain view or "open fields" and the "hot pursuit" doctrines to justify Santana's warrantless arrest, thus making the decision a very narrow one, he could not join in the decision because it did not depend upon the presence of exigent circumstances. 427 U.S. at 46–47, 96 S.Ct. 2406.

The closest this Court has come to deciding this question squarely is the recent decision of *United States v. Jarvis,* 560 F.2d 494 (2d Cir. 1977), *cert. denied,* —— U.S. ——, 98 S.Ct. 1511, 55 L.Ed.2d 532 (U.S. Mar. 20, 1978).[7] There, the Court considered

---

**7.** A careful reading of this Court's decisions reveals that the precise issue presented by this case has been avoided, reserved or referred to in dictum, or has been considered in circumstances involving consent or exigent circumstances, or has not been raised by the parties. *See, e. g., United States v. Berenguer,* 562 F.2d 206, 210 & n.5 (2d Cir. 1977); *United States v. DiStefano,* 555 F.2d 1094, 1100 n.5 (2d Cir. 1977); *United States v. Mejias,* 552 F.2d 435, 443–45 (2d Cir. 1977), *cert. denied,* 434 U.S. 847, 98 S.Ct. 154, 54 L.Ed.2d 115 (1977); *Rodriguez v. Butler,* 536 F.2d 982 (2d Cir.), *cert. denied,* 429 U.S. 943, 97 S.Ct. 362, 50 L.Ed.2d 313 (1976); *United States v. Gonzales,* 483 F.2d 223, 224–25 & n.2 (2d Cir. 1973); *United States v. Fernandez,* 480 F.2d 726, 740 n.20 (2d Cir. 1973); *United States v. Mapp,* 476 F.2d 67, 74 (2d Cir. 1973); *Williams v. United States,* 463 F.2d 1183, 1184–85 (2d Cir.), *cert. denied,* 409 U.S. 967, 93 S.Ct. 299, 34 L.Ed.2d 232 (1972); *United States v. Wilkes,* 451 F.2d 938, 940 n.3 & n.6 (2d Cir. 1971); *United States v. Manning,* 448 F.2d 992, 998–99 (2d Cir.) (*en banc*), *cert. denied,* 404 U.S. 995, 92 S.Ct. 541, 30 L.Ed.2d 548 (1971); *United States ex rel. Cardaio v. Casscles,* 446 F.2d 632, 637–38 (2d Cir. 1971); *United States v. Gaines,* 441 F.2d 1122 (2d Cir.), *vacated and remanded,* 404 U.S. 878, 92 S.Ct. 223, 30 L.Ed.2d 159 (1971), *on remand, aff'g on other grounds,* 460 F.2d 176, *cert. denied,* 409 U.S. 883, 93 S.Ct. 172, 34 L.Ed.2d 139

"whether under fourth amendment standards it was permissible to arrest [a suspect] in his home at midday, following a forcible entry, without a valid warrant . . . ." 560 F.2d at 498. Referring to the *en banc* decision of the District of Columbia Circuit, *Dorman v. United States*, 140 U.S.App.D.C. 313, 435 F.2d 385 (1970), which determined that exigent circumstances were required if a warrantless arrest was to be effected in the home, the Court concluded that "[u]nder [the *Dorman*] criteria the Jarvis arrest could not be upheld" and that "[t]here is therefore serious question whether the forcible entry into Jarvis' home without a valid warrant and in the absence of exigent circumstances meets the requirement of the statute [18 U.S.C. §§ 3052] or fourth amendment standards of reasonableness." 560 F.2d at 498. The Court declined to suppress the evidence that had been seized, however, because "[t]he illegal arrest . . . was not a 'but for' cause for the introduction of [that] evidence . . . ." *Id.* The Court noted further that "no evidence [was] being challenged which could not have been obtained even without the illegal arrest" and that it was not confronted with a case "where the government 'exploits' an unlawful arrest" but with a case in which " 'the arrest made in good faith

turns out to [be] illegal' " because of an invalid arrest warrant. 560 F.2d at 499, *quoting United States v. Edmons*, 432 F.2d 577, 584 (2d Cir. 1970). We here follow the lead of *Jarvis*.

It is settled that "searches conducted outside the judicial process,without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967) (footnote omitted); *see G. M. Leasing Corp. v. United States*, 429 U.S. 338, 358, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977); *Cady v. Dombrowski*, 413 U.S. 433, 439, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. United States District Court*, 407 U.S. 297, 315–16, 318, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); *Coolidge v. New Hampshire, supra*, 403 U.S. at 454–55, 479, 91 S.Ct. 2022; *Chambers v. Maroney*, 399 U.S. 42, 51, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *Camara v. Municipal Court*, 387 U.S. 523, 528–29, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). It is apparent from *Watson* and

(1972); *United States v. Pino*, 431 F.2d 1043, 1044–45 (2d Cir. 1970), *cert. denied*, 402 U.S. 989, 91 S.Ct. 1675, 29 L.Ed.2d 154 (1971); *United States v. Lozaw*, 427 F.2d 911, 914–15 (2d Cir. 1970); *id.* at 917· (Lumbard, *C. J.*, and Hays, *J.*, concurring); *United States v. Llanes*, 398 F.2d 880, 883 (2d Cir. 1968), *cert. denied*, 393 U.S. 1032, 89 S.Ct. 647, 21 L.Ed.2d 576 (1969); *United States v. McMillan*, 368 F.2d 810 (2d Cir. 1966), *cert. denied*, 386 U.S. 909, 87 S.Ct. 856, 17 L.Ed.2d 783 (1967); *United States v. Conti*, 361 F.2d 153 (2d Cir. 1966), *vacated on other grounds*, 390 U.S. 204, 88 S.Ct. 899, 19 L.Ed.2d 1035 (1968); *United States v. Monticallos*, 349 F.2d 80 (2d Cir. 1965); *United States v. Hall*, 348 F.2d 837, 841–42 (2d Cir.), *cert. denied*, 382 U.S. 947, 86 S.Ct. 408, 15 L.Ed.2d 355 (1965); *United States v. Price*, 345 F.2d 256 (2d Cir.), *cert. denied,* 382 U.S. 949, 86 S.Ct. 404, 15 L.Ed.2d 357 (1965); *United States v. Miguel*, 340 F.2d 812 (2d Cir.), *cert. denied*, 382 U.S. 859, 86 S.Ct. 116, 15 L.Ed.2d 97 (1965); *United States v. Nicholas*, 319 F.2d 697 (2d Cir.), *cert. denied*, 375 U.S. 933, 84 S.Ct. 337, 11 L.Ed.2d 265 (1963).

Today's decision is in accord with the law of the Sixth, Ninth and District of Columbia Circuits. *United States v. Killebrew*, 560 F.2d 729 (6th Cir. 1977); *United States v. Calhoun*, 542 F.2d 1094, 1102–03 (9th Cir. 1976), *cert. denied*, 429 U.S. 1064, 97 S.Ct. 792, 50 L.Ed.2d 781 (1977); *Dorman v. United States*, 140 U.S.App. D.C. 313, 435 F.2d 385 (1970) (*en banc*). *See also United States v. Gardner*, 553 F.2d 946 (5th Cir. 1977), *cert. denied*, —— U.S. ——, 98 S.Ct. 722, 54 L.Ed.2d 753 (1978); *United States v. Harper*, 550 F.2d 610 (10th Cir. 1977), *cert. denied*, 434 U.S. 834, 98 S.Ct. 128, 54 L.Ed.2d 99 (1977); *Salvador v. United States*, 505 F.2d 1348 (8th Cir. 1974); *United States v. Davis*, 461 F.2d 1026 (3d Cir. 1972); *Vance v. North Carolina*, 432 F.2d 984 (4th Cir. 1970).

*See generally* Rotenberg & Tanzer, *Searching for the Person to be Seized*, 35 Ohio S.L.J. 56 (1974); Wilgus, *Arrest Without a Warrant*, 22 Mich.L.Rev. 798 (1924); Comment, 82 Dick.L. Rev. 167 (1977); Comment, 13 San Diego L.Rev. 838 (1976); Note, 23 Stan.L.Rev. 995· (1971).

*Santana* that the same cannot be said regarding arrests in public places based upon probable cause. In this case, however, we consider not the constitutionality of an arrest in a public place but that of an arrest in an intrinsically private place—the home. This calls to the fore significant interests which are not present when a suspect is arrested in a public place. "When the stakes are this high, the detached judgment of a neutral magistrate is essential if the Fourth Amendment is to furnish meaningful protection . . . ." *Gerstein v. Pugh,* 420 U.S. 103, 114, 95 S.Ct. 854, 863, 43 L.Ed.2d 54 (1975).

▪ It is by now a commonplace that the Fourth Amendment protects citizens' reasonable expectations of privacy. *See Katz v. United States, supra,* 389 U.S. at 351–52; *id.* at 361, 88 S.Ct. 507 (Harlan, *J.,* concurring). It is also clear that one's reasonable expectation of privacy in the home is entitled to a unique sensitivity from federal courts. *See, e. g., United States v. Martinez-Fuerte,* 428 U.S. 543, 561, 565, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976) ("the sanctity of private dwellings [is] ordinarily afforded the most stringent Fourth Amendment protection.") (private dwellings involve "strong Fourth Amendment interests that justify the warrant requirement."); *South Dakota v. Opperman,* 428 U.S. 364, 367, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976) ("less rigorous warrant requirements govern [automobile searches] because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." (footnote omitted)); *United States v. United States District Court, supra,* 407 U.S. at 313, 92 S.Ct. at 2134 ("physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed . . . ."); *Warden v. Hayden, supra,* 387 U.S. at 301, 87 S.Ct. 1642, 1646, 18 L.Ed.2d 782 (the Fourth Amendment is intended to protect " 'the sanctities of a man's home and the privacies of life.' "), *quoting Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886); *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 683, 5 L.Ed.2d 734 (1961) ("At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."); *Miller v. United States,* 357 U.S. 301, 307, 78 S.Ct. 1190, 1194, 2 L.Ed.2d 1332 (1958) (government entry into house "invades the precious interest of privacy . . . ."); *McDonald v. United States,* 335 U.S. 451, 453, 456, 69 S.Ct. 191, 192, 93 L.Ed. 153 (1948) (the Fourth Amendment "marks the right of privacy as one of the unique values of our civilization . . . .") ("the Constitution requires a magistrate to pass on the desires of the police before they violate the privacies of the home."); *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed.2d 436 (1948) ("The right of officers to thrust themselves into a home is . . . a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security . . . ."); *Dorman v. United States, supra,* 140 U.S.App.D.C. at 317, 435 F.2d at 389 ("Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment."); *Commonwealth v. Forde,* 367 Mass. 798, 805, 329 N.E.2d 717, 722 (1975) ("The right of police officers to enter into a home, for whatever purpose, represents a serious governmental intrusion into one's privacy. It was just this sort of intrusion that the Fourth Amendment was designed to circumscribe by the general requirement of a judicial determination of probable cause."); Coke, Third Institute 162 (1644) ("a man's house is his castle.").

Here, we have little difficulty in determining that Reed was arrested in a place in which she was entitled to a reasonable expectation of privacy. Agent Bell testified that he placed Reed under arrest in the living room-dining room part of the apartment after advising her at the door that his purpose was to place her under arrest. Reed testified that the agents "rushed in" immediately after she pulled the door open and then arrested her. The district court believed that Reed was arrested when she opened the door. No matter which of these

versions is the most accurate, Reed's arrest was effected not in a "public" place but in a place protected by the Fourth Amendment. She was not arrested in the hallway of the apartment building.[8] Nor was she standing on the threshold of her apartment in such a way that she would have been inside the apartment by taking a step backward and "outside" by taking a step forward. She was not "as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." *United States v. Santana, supra,* 427 U.S. at 42, 96 S.Ct. at 2409, *citing Hester v. United States,* 265 U.S. 57, 59, 44 S.Ct. 445, 446, 68 L.Ed. 898 (1924) ("the special protection accorded by the Fourth Amendment . . . is not extended to the open fields."). Rather, she was arrested inside her home.

■ It is, of course, not enough to say that Reed had a protected privacy interest in her apartment; we must also find that that interest was invaded by the government agents. We believe that it was.[9] Merely being arrested is for most persons an "awesome and frightening" experience, an invasion of considerable proportion. ALI, Model Code for Pre-Arraignment Procedure, Commentary 290–91 (1975); *see Foley v. Connelie,* —— U.S. ——, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978) ("An arrest . . . is a serious matter for any person . . . .. Even the routine traffic arrests

made by the state trooper . . . can intrude on the privacy of the individual."); *United States v. Watson, supra,* 423 U.S. at 428, 96 S.Ct. at 830. (Powell, *J.,* concurring) ("A search may cause only annoyance and temporary inconvenience to the law-abiding citizen, assuming more serious dimension only when it turns up evidence of criminality. An arrest, however, is a serious personal intrusion regardless of whether the person seized is guilty or innocent."); *Chimel v. California, supra,* 395 U.S. at 776, 89 S.Ct. at 2047 (White, *J.,* dissenting) ("the invasion and disruption of a man's life and privacy which stem from his arrest are ordinarily far greater than the relatively minor intrusions attending a search of his premises."). To be arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home. This is simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances, even when it is accomplished under statutory authority and when probable cause is clearly present.

■ In *Accarino v. United States,* 85 U.S. App.D.C. 394, 179 F.2d 456, 464 (D.C.Cir. 1949), *cited with approval in Miller v. United States, supra,* 357 U.S. at 306, 311, 78 S.Ct. at 1194, the District of Columbia Circuit noted:

A man in his own home has a right of privacy which he does not have when on

8. *Compare United States v. Wilkes, supra,* 451 F.2d at 941 n.6; *United States v. Pino, supra,* 431 F.2d at 1044; *United States v. Llanes, supra,* 398 F.2d at 883; *United States v. Conti, supra,* 361 F.2d at 155; *United States v. Miguel, supra,* 340 F.2d at 814; *United States v. Nicholas, supra,* 319 F.2d at 698. *See also United States v. Carriger,* 541 F.2d 545 (6th Cir. 1976); *United States v. Anderson,* 533 F.2d 1210, 1214 (D.C.Cir.1976).

9. The government does not attempt to argue that Reed consented either to the entry for purposes of making the arrest or to the seizure of the telephone books. Had the government chosen to make such an argument, it would have had a difficult time indeed meeting the heavy burden for showing the existence of genuine consent. *See United States v. Watson, supra,* 423 U.S. at 424–25, 96 S.Ct. 820, *Schneckloth v. Bustamonte, supra,* 412 U.S. at 248, 93 S.Ct. 2041; *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797

(1968); *United States v. Miley,* 513 F.2d 1191, 1201–02 (2d Cir.), *cert. denied,* 423 U.S. 842, 96 S.Ct. 74, 46 L.Ed.2d 62 (1975). We do not believe that the fact that Reed opened the door to her apartment in response to the knock of three armed federal agents operated in such a way as to eradicate her Fourth Amendment privacy interest. *Cf. Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 391–92, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); *Wolf v. Colorado,* 338 U.S. 25, 28, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949). To hold otherwise would be to present occupants with an unfair dilemma, to say the least—either open the door and thereby forfeit cherished privacy interests or refuse to open the door and thereby run the risk of creating the appearance of an "exigency" sufficient to justify a forcible entry. This would hardly seem fair in situations that present no exigent circumstances in the first place.

the public street. That additional right imposes additional requirements upon the power of arrest. . . . "We emphasize that no matter who the officer is or what his mission, a government official cannot invade a private home, unless (1) a magistrate has authorized him to do so or (2) an immediate major crisis in the performance of duty affords neither time nor opportunity to apply to a magistrate."

. . . . .

. . . If nothing additional were required, a man's right of privacy in his home would be no more than his rights on the street; and the right to arrest without a warrant would be precisely the same as the right to arrest with a warrant.

We quite agree. *Cf. Coolidge v. New Hampshire, supra,* 403 U.S. at 513, 91 S.Ct. at 2061. (White, *J.,* concurring and dissenting) ("effects enjoy derivative protection when located in a house or other area within reach of the Fourth Amendment."). The mere fact that the entry of the home is for the purpose of accomplishing an arrest rather than a search for or seizure of "things" does not affect the need for a warrant in circumstances such as these. As was argued by the appellants in *Lankford v. Gelston,* 364 F.2d 197, 205 (4th Cir. 1966) (*en banc*), "from the standpoint of the victim, the invasion of the privacy of his home is unaffected by the object of the policeman's search." Indeed, it would be

> incongruous to pay homage to the considerable body of law that has developed to protect an individual's belongings from unreasonable search and seizure in his home, and at the same time assert that identical considerations do not operate to protect the individual himself in the same setting.

*People v. Ramey,* 16 Cal.3d 263, 275, 127 Cal.Rptr. 629, 636, 545 P.2d 1333, 1340 (In

Banc), *cert. denied,* 429 U.S. 929, 97 S.Ct. 335, 50 L.Ed.2d 299 (1976). *See also United States v. Dorman, supra,* 140 U.S.App.D.C. at 318, 435 F.2d at 390; *Morrison v. United States,* 104 U.S.App.D.C. 352, 355, 262 F.2d 449, 452 (1958). Accordingly, we hold that, in the absence of a warrant to arrest a suspect at home,[10] and in the absence of exigent circumstances, federal law enforcement officers are prohibited by the Fourth Amendment from entering the home of a suspect to effect a felony arrest for which they otherwise have both statutory authority and probable cause.

 As in *Jarvis,* we join the District of Columbia Circuit regarding the various factors that may be used to determine whether "exigent circumstances" are present. These include (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of probable cause . . . to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry. *Dorman v. United States, supra,* 140 U.S.App.D.C. at 320, 435 F.2d at 392–93 (footnotes omitted); *United States v. Jarvis, supra,* 560 F.2d at 498. This neither requires that federal agents obtain a warrant at the earliest possible moment, *see Cardwell v. United States,* 417 U.S. 583, 595–96, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (plurality opinion), nor is it likely to cause significant delay, *see McDonald v. United States, supra,* 335 U.S. at 455, 69 S.Ct. 191; *Johnson v. United States, supra,* 333 U.S. at 15, 68 S.Ct. 367; *Chappell v. United States,* 119 U.S.App.D.C. 356, 359, 342 F.2d 935, 938 (1965) (Burger, *J.*). It does, however, place on the government a reasonable burden of justifying a warrantless entry and arrest. Here, inasmuch as

---

10. *See United States v. Santana, supra,* 427 U.S. at 44, 96 S.Ct. 2406 (Stevens, J., concurring); *Dorman v. United States, supra,* 140 U.S.App.D.C. at 324 n.25, 435 F.2d at 396 n.25;

*id.* at 402–03 & n.6 (Wright, J., concurring in part and dissenting in part); 8 Moore's Federal Practice ¶ 4.04[4], at 4–29 & n.33 (2d ed. 1977).

the DEA Agents had no contact whatsoever with Reed or Goldsmith for two and one-half months prior to their arrest, and since there is no suggestion of a change in the status of the investigation during that period, we cannot conclude that exigent circumstances were present. Accordingly, Reed's arrest was unlawful.

Because the arrest was unlawful, the government is precluded from justifying the seizure of the telephone books either on the basis of the "plain view" or "search incident to arrest" exceptions to the search warrant requirement of the Fourth Amendment. Because the telephone books were seized illegally, they should not have been introduced at trial.[11] *See Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Edmons, supra,* 432 F.2d at 584–85.

We do not believe beyond a reasonable doubt that the introduction of the telephone books at trial was harmless error. Reed argued at trial that she had been entrapped by McCray, the DEA's paid informant. The prosecutor referred to the books in the following way when the district judge inquired as to their relevance:

> Within those telephone books are telephone numbers for individuals named James Crowley, P.P. [sic], Paulie, Marlowe, and I believe that there are other names in those books of drug traffickers.

> \* \* \* \* \* \*

The Government's claim for relevance is based upon the presence in those books of the names of the unindicted co-conspirators in this case that I have just named.

At a suppression hearing during trial, the prosecutor characterized the books as "damaging evidence." In summation, the prosecutor made the following comments:

> Let's say Special Agent Bell is wrong, no table, no phone, but we have the address books and when Nancy Reed testified I

asked her, "Are these your address books?"

> She said, they were, although she said Bell was lying about where he got them. The point is these people sold narcotics. Those address books are Nancy Reed's and you are going to learn something about what is in them, and the telephone is where every telephone is.

> \* \* \* \* \* \*

> When considering the case against Nancy Reed, take a look at her address books. There are some interesting numbers in these address books. P.T.'s telephone number, Paulie's telephone number, and you'll find James Crowley's telephone number. James Crowley, who is supposedly Goldsmith's source, is in Nancy Reed's address book.

> \* \* \* \* \* \*

> Mr. Markfield [Reed's attorney] says that the Paul Levy deal is a figment of somebody's imagination. That telephone number in the address book isn't a figment of anybody's imagination. It is there several times in both books.

These comments were quite clearly intended to discredit Reed's claim that she had been entrapped. Jury deliberations began at 2:00 p. m. on June 14, 1977. By 3:15 p. m., the jury requested that it be allowed to examine the books. On these facts, we are unable to declare our belief that the error did not affect the outcome. *Chapman v. California,* 386 U.S. 18, 22–24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *see also Bumper v. North Carolina,* 391 U.S. 543, 553, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) (Harlan, *J.,* concurring); R. Traynor, The Riddle of Harmless Error, 37–49 (1970).

*Goldsmith's Claims*

Goldsmith argues that the statements he made to the DEA Agents and to the Assistant United States Attorney after his arrest were involuntary and should not have been admitted into evidence. He claims that the agents knew he was con-

---

11. The remedy for an illegal arrest is not dismissal but suppression of any evidence obtain-ed as a result of the arrest. *See Gerstein v. Pugh, supra,* 420 U.S. at 119, 91 S.Ct. 2022.

cerned about his job, his bail status and the possibility of his state parole being revoked, and that they used that knowledge to their advantage by promising assistance to him in exchange for incriminating statements. We find this argument unpersuasive. Goldsmith was repeatedly advised of his constitutional rights. He was, in fact, told that if he cooperated reasonable bail terms would be recommended and that an effort would be made to contact state parole officers. He was also told, however, that the federal agents had little if anything to do with state parole revocation practices. The test is "whether an examination of all the circumstances discloses that the conduct of 'law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . .'." *United States v. Ferrara*, 377 F.2d 16, 17 (2d Cir.), *cert. denied*, 389 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967), *quoted in United States v. Pomares*, 499 F.2d 1220, 1222 (2d Cir.), *cert. denied*, 419 U.S. 1032, 95 S.Ct. 514, 42 L.Ed.2d 307 (1974). We agree with the district judge that Goldsmith's statements were voluntarily made, and, accordingly, we hold that they were properly admitted.

Goldsmith also argues that the district court abused its discretion by ruling at a pre-trial hearing that Goldsmith's prior conviction could be used to impeach him, contending that the conviction was too remote in time, that the crime involved was a violent one rather than one involving dishonesty and that the court made insufficient findings as to admissibility. We disagree.

■■■■■ Goldsmith was convicted in New York in November of 1967 on charges of felonious possession of a dangerous weapon, grand larceny in the first degree, robbery in the third degree and assault in the first degree and was sentenced to twenty-nine years imprisonment; he was released on September 2, 1974. His federal trial started on June 8, 1977. Rule 609(b) of the Federal Rules of Evidence provides as follows:

Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than 10 years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

*See generally,* 3 J. Weinstein & M. Berger, Evidence ¶ 609[03], at 609–70 (1976). As the district court correctly ruled, Goldsmith's conviction and his release both occurred within the ten-year period prescribed by the rule. Goldsmith did not argue below that the nature of the crime of which he was convicted had no bearing on his credibility as a witness; he is barred from raising it now. Fed.R.Crim.P. 12(f); *United States v. Perez*, 565 F.2d 1227, 1232 (2d Cir. 1977); *United States v. Fuentes*, 563 F.2d 527, 531 (2d Cir. 1977). Even if it had been raised, the conviction would have been admissible under Fed.R.Evid. 609(a)(1) and there would have been no need to consider admissibility under Fed.R.Evid. 609(a)(2).[12] *See United States v. Hawley*, 554 F.2d 50, 52–53 & n.7 (2d Cir. 1977); *United States v. Papia*, 560 F.2d 827, 845–48 & n.14 (7th Cir. 1977); *United States v. Smith*, 551 F.2d 348, 356–65 (D.C.Cir.1976).

---

**12.** The rule provides as follows:

For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment.

Finally, the district court cannot be faulted for failing to make extensive findings in response to a mere inquiry at a pre-trial hearing, unaccompanied by either facts or argument. *See United States v. Costa,* 425 F.2d 950, 954 (2d Cir. 1969), *cert. denied,* 398 U.S. 938, 90 S.Ct. 1843, 26 L.Ed.2d 272 (1970).

We also reject Goldsmith's argument that the district court's charge with regard to the voluntariness of his statements was improper. The charge was virtually identical to the language of the statute. 18 U.S.C. § 3501(a). *Compare United States v. Barry,* 518 F.2d 342 (2d Cir. 1975).

*Conclusion*

The judgment entering conviction of Reed is reversed and her case is remanded to the district court for a new trial; judgment of conviction of Goldsmith is affirmed.

Winter and Butzner, Circuit Judges, dissented from decision of the court en banc for reasons stated in opinion by Thomsen, Senior District Judge, prepared for majority of the panel.