**The UNITED STATES of America**

v.

**George SALMASIAN, William B. Van Pelt and Robert Louis Cinnante.**

No. CR–81–17.

United States District Court, W. D. New York.

June 8, 1981.

Richard J. Arcara, U. S. Atty., Buffalo (Matthew J. Murphy, III, Asst. U. S. Atty., Buffalo, of counsel), for plaintiff.

Gene A. Garcia, Corpus Christi, Tex., and David R. Knoll, Buffalo, N. Y., for defendant Salmasian.

Dan Alfaro, Corpus Christi, Tex., and Michael G. Wolfgang, Buffalo, N. Y., for defendant Cinnante.

## MEMORANDUM

ELFVIN, District Judge.

This Memorandum explains my denial, by Order entered June 1, 1981, of defendants' motion to suppress certain evidence seized at the time of their arrest February 14, 1981 on charges of dealing in cocaine.

Defendants Salmasian and Cinnante[1] were arrested shortly after 9:00 a. m. in room 513 of the Sheraton Inn-Buffalo East hotel ("the Sheraton") in a suburb of Buffalo, N.Y. Based on testimony adduced at the suppression hearing, it appears that since approximately October 1980 Salmasian had been under investigation first by Canadian and then by United States authorities as a suspected trafficker in cocaine. Dennis Massey, a Royal Canadian Mounted Police ("the RCMP") corporal, and United States Drug Enforcement Administration ("the DEA") special agents John Brown and Nancy Burgstahler, employing the services of one Pablo Viscosa, an informant for the RCMP, contacted Salmasian and commenced negotiations for a sale to them by Salmasian of some eight kilograms of cocaine. On February 11, 1981 a "sample" consisting of approximately one kilogram of diluted cocaine had been delivered to Burgstahler by Van Pelt, after discussions between Massey and Salmasian. At this

1. Van Pelt was not arrested and remains a fugitive.

time, the law enforcement agents had no direct evidence of possession or distribution of cocaine by Salmasian. Declaring themselves satisfied with the sample, the law enforcement agents thereafter contacted Salmasian to arrange for sale of the full eight kilograms. Late in the evening of February 13, 1981, Salmasian registered in room 513 of the Sheraton, which room had been arranged by the law enforcement agents as one located among several other rooms to be occupied by law enforcement personnel. Shortly after 9:00 a. m. February 14th, Corporal Massey telephoned Salmasian in room 513 from the hotel's lobby; Brown and Burgstahler thereafter went to room 513, in which room Salmasian and Cinnante were. Salmasian removed from a zippered canvas carryall a paper-wrapped package purportedly containing cocaine. Brown and Burgstahler removed some cocaine from this package, said they would test it and, if it also proved satisfactory, they would return "in an hour" with money for the purchase. Instead, as they exited the door to room 513, the agents signalled to other agents who were waiting in the adjoining rooms. A number of agents thereafter rushed into room 513 and arrested Salmasian and Cinnante, and pretended to arrest Brown and Burgstahler to delay defendants' realization that they were, in fact, "undercover" police officers.

Room 513 is a usual type of modern hotel room; the door from the common hall opens onto a short passageway adjoining the bathroom; at the end of this short passageway is the sleeping area, containing two queen-size beds along one side wall, separated by a nightstand; along the other side wall is a combined dresser and desk; between the farther bed and the far (or window) wall is an open area with two or more chairs and a TV set. At the time of the arrest, Cinnante was seated in one of the chairs (there was some conflict whether the TV set was on and whether Cinnante was watching it); Salmasian was standing between the two beds. At the time of the arrest, the canvas bag was located either on one of the beds or on an unoccupied vanity chair; it was unzipped, and paper parcels, apparently identical to the one earlier removed from the bag, proffered by Salmasian as containing cocaine and opened for sampling, could be viewed within. On the dresser, some four feet from where Salmasian was standing, was an open briefcase or attache case, containing, in open view, a substantial quantity of currency, handcuffs, and various papers. Salmasian was asked if such case was his and he responded affirmatively; he was then asked how much money was in the case and responded that he didn't know. An agent thereafter began counting the money, which was in various places and parcels in the case, in Salmasian's presence; at some point the combination-lock briefcase was inadvertently closed and locked; Salmasian was asked for, and gave, the combination to reopen it (such combination was used and the case was reopened). Salmasian by that time was sitting on the floor, between the feet of the beds and the dresser, with a wet washcloth applied to the back of his neck, which had been procured from the bathroom by an agent and was applied after Salmasian had momentarily become faint.

During the course of counting the money, the agent performing such counting discovered an additional paper-wrapped package that appeared to contain cocaine. The nature of the papers in the briefcase was not specified at the suppression hearing; it is suggested that they relate to transactions in cocaine and the implication is that some analysis of them will be used at trial.

Defendants move to suppress the canvas carryall and its contents, and Salmasian's briefcase and its contents. Such motion is primarily on two grounds: that their arrest, made without a warrant, violated the Fourth Amendment to the United States Constitution and that all evidence seized incident thereto must be suppressed; and, second, that even if the arrest was lawful, the relevant items were not validly seized as an incident to such arrest and could only have been properly seized pursuant to a search warrant (which concededly had not been obtained and was not present) and, accordingly, must be suppressed for that reason also.

*Lack of Arrest Warrant*

■ The United States Supreme Court held last year, and the United States Court of Appeals for the Second Circuit held three years ago, that absent exigent circumstances a warrant is required to arrest an individual inside his home. *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *United States v. Reed,* 572 F.2d 412 (2d Cir.), *cert. denied,* 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978). Also, I assume *arguendo* (but do not decide) that an individual inside a hotel room is entitled to the same degree of protection from warrantless arrests as he would have in his own home (*cf., Hoffa v. United States,* 385 U.S. 293, 301, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966)), although, in the context of search warrants, it has been held that a hotel room occupant does not have a reasonable expectation of the same level of privacy as one enjoys in his home (*see, United States v. Agapito,* 620 F.2d 324, 330–31 (2d Cir.), *cert. denied,* —— U.S. ——, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980)) and although room 513 was arguably less a dwelling than a place of business (see *United States v. Dien,* 609 F.2d 1038, 1046 (2d Cir. 1979)). Defendants argue that the government agents could readily have obtained a warrant after February 11, 1981 for the arrest of the defendants in the instant case. This argument is true in part but not entirely. First, it appears that the United States had no knowledge of Cinnante's involvement until his introduction to Brown and Burgstahler by Salmasian in the room on February 14, 1981; clearly, no warrant could have been obtained for his arrest on any of the charges embodied in the counts of the Indictment. Second, no warrant could have been obtained for the arrest of either Salmasian or Cinnante as to the crime later charged in Count III of the Indictment;[2] Fed.R.Crim.P. Rule 4 requires a showing of probable cause that a crime

has been committed; there had been no distribution of cocaine by Salmasian or by Cinnante, as charged in Count III, prior to the morning of February 14th; therefore, although the United States had substantial basis for believing that Salmasian *would* commit the crime charged in Count III, until February 14th it would not have been possible to obtain an arrest warrant on Count III's charges. Moreover, I am convinced that the United States possessed the requisite exigent circumstances for a warrantless arrest on such charges. Very serious criminal activity was involved; the agents had cause to believe that a weapon or weapons would be present and, once in the room, that under the disturbed area of one bedspread there reposed a weapon (a belief that turned out to be well-founded); there was an exceptionally strong showing of probable cause; packages or "bricks" of cocaine were actually present and exhibited; there was absolute knowledge that the suspects were in room 513; inasmuch as the defendants did not reside in this area and as Salmasian had made statements suggesting that he was an experienced drug dealer, there was at least a reasonable belief that defendants might have become suspicious and have departed for places unknown if Burgstahler and Brown had not returned within the promised hour, which time limit could easily be exceeded in obtaining a warrant; finally, the entry was largely peaceable. Under these criteria, set forth by the United States Court of Appeals for the Second Circuit in *United States v. Reed, supra,* 572 F.2d at 424, the warrantless arrest was clearly lawful as to the crime charged in Count III and as to Cinnante on all counts charged. I decline, moreover, to hold, in the absence of any controlling authority, that the United States was required to have obtained a warrant as to the other charged crimes before engaging in the clearly proper arrest for the February 14th

---

2. Count III charges Salmasian and Cinnante with having distributed 19.3 pounds of "cocaine" February 14th; Count I charges the three defendants with having from January 15th to February 14th conspired to distribute "cocaine"; Count II charges Salmasian and

Van Pelt with having distributed 2.2 pounds of "cocaine" February 11th; and Count IV charges Salmasian alone with having used a telephone in the business of distributing "cocaine."

distribution count. First, I find that the same factors listed by the appellate court in *United States v. Reed, supra,* are present (although in less overwhelming force than noted above as to Count III) and would support a warrantless arrest as to all the counts. Exigent circumstances justifying a warrantless arrest may exist even if there is technically time to acquire a warrant; time is only one factor. Second, on the facts of this case, requiring a warrant as to the earlier-committed crimes would seriously interfere with a legitimate police inquiry without any countervailing justification. Once a warrant would have been obtained, there would have been a positive duty on the government to execute the same promptly; where, as here, it is believed that the person named in the warrant may shortly commit additional and more serious crimes than those able to be listed in the warrant and is under surveillance for the same, this requirement of promptness might well force the police either to abandon prosecution of the already-committed crimes or to move in prematurely and destroy any hopes of prosecution of the prospective crimes. Such might be justified if it served any significant interests related to the Fourth Amendment; here, however, it does not. A warrantless intrusion into the room and restraint on personal liberty was already permissible as to Count III; the scope of the intrusion into the protected areas would not be lessened by having had the scrutiny of a neutral magistrate as to probable cause for arrest for other crimes with which the defendants or some of them later find they are charged. The arrests herein were lawful.

■ This finding requires reaching defendants' second argument: that the property could not be seized without a search warrant. Warrantless seizures are presumptively unlawful, and the remedy for such illegality is suppression of the items seized. However, there are exceptions to the warrant requirement, two of which— "plain view" and "search incident to arrest" —arguably apply to the seizure at issue. The United States argues that either of these exceptions supports the seizures here-in, but presents a detailed argument only on the "plain view" exception.

Such exception permits seizure of any items "inadvertently" seen by the police, without special instruments, from any location where they are lawfully present, provided that it is "immediately apparent" that the items seized are evidence. See *United States v. Ochs,* 595 F.2d 1247, 1256–58 (2d Cir. 1979). The same court has determined that a "plain view" seizure will be found "inadvertent" unless, at minimum, the police enter the premises with probable cause to believe that the items seized are present. *United States v. Liberti,* 616 F.2d 34, 37 (2d Cir. 1980). It is also probable that the "inadvertence" requirement does not apply at all to contraband—*e. g.,* the cocaine in this action—as noted in both opinions in *Liberti,* but I need not decide this issue.

■ The evidence quite clearly shows that when Burgstahler and Brown entered room 513 pursuant to Salmasian's invitation the police "suspected" but did not have probable cause to believe that the bulk of the cocaine was in the room; they had no knowledge of the briefcase. From the time of such initial entry, events proceeded continuously; the "inadvertence" of the police should be governed by their knowledge at the beginning of the set of events. There is no serious dispute but that the wrapped parcels of cocaine, visible through the unzipped and open top of the canvas bag, were properly seen and seized.

■ There is a more tenable argument with respect to the briefcase and its contents. The preponderance of the evidence shows that the cocaine therein was not visible from the outside, but was only seen after one of the agents began counting the money. However, it was clearly proper and almost required that the agents count and inventory at once the large sum of money found in an open briefcase, that would be taken into their custody after the impending removal of defendants from the room. The package of cocaine was found in the course of such inventory; such find was inadvertent and it was immediately appar-

**690**

ent that it was evidence. The papers were in clear and open view, without the need for any searching; finding them was inadvertent. However, the nature of the papers found has not been specified; it is suggested that they are evidence of transactions in cocaine. Seizures of a wide variety of ledgers, account books, address books and similar items have been found within the "plain view" exception. See *United States v. Ochs, supra,* at 1257 n.8. However, at the present time there is not sufficient evidence before me to hold definitively whether it was "immediately apparent" that the seized papers were evidence and, therefore, whether the seizure was lawful; I have therefore denied, but without prejudice, defendants' motion to suppress the papers found in the briefcase.

■ Alternatively, as the briefcase was open on the dresser, was in the same room with and in close proximity to a large amount of cocaine and contained a suspiciously large sum of cash and, moreover, a pair of handcuffs, the arresting officers were entitled briefly to inspect the same to determine if evidence was contained therein. *See, e. g., United States v. Ochs, supra.* This would also support the finding and seizure of the package of cocaine.

■ Additionally, defendants place no stress on, and I do not find relevant, the inadvertent locking of the briefcase in the course of the inventory. The investigation into the contents was already underway; it was not required to be interrupted until a warrant could have been obtained, inasmuch as the police officers had already handled and been in contact with the money and it was important that the potential for a dispute over the amount thereof be avoided.

Defendants place much stress on *Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), and *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). Neither decision applies to the action at bar; in each, the police had taken exclusive custody of a locked, closed container, removed it from the place where it had been seized and, only then and

in the absence of any pressing circumstances, opened it without any warrant. Herein the contents of the carryall and the briefcase were seized and inspected at the immediate time and place of arrest; moreover, at least as to the briefcase, the presence of a sizable quantity of loose currency demanded an immediate inventory. The seizure of the items sought to be suppressed was lawful, under the "plain view" exception to the Fourth Amendment requirement for a warrant.

The United States declined to argue the applicability of the "search incident to arrest" (*Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969)) exception to the warrant requirement. I therefore decline to consider such exception, such declination being without prejudice to the ability to the parties to argue the same should I hold that the evidentiary nature of the papers seized from the briefcase was not "immediately apparent."