**UNITED STATES of America,**

v.

Herbert **KORNBLAU,** Sheldon Pett, a/k/a "Carl", Ferdinando Daniele, Virgil Capote, Glenn Joseph Keating, Luis M. Santiago, Charles Montgomery, Joseph DeCarlo, Richard Stone, Steven Lackowitz, Arthur Caballero, Alden Belkin, Edward O'Grady, Ronald Fred Fishman, a/k/a "Ron Moore", Michael Hyman Henry, Michael J. Haber, Lawrence Haber, Daniel Robert Thorud, Roberto Quevedo, and Raymond Dmytrow, Defendants.

No. 83 Cr. 0756 (KTD).

United States District Court,
S.D. New York.

May 7, 1984.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for United States of America; Stephen F. Markstein, Asst. U.S. Atty., New York City, of counsel.

Penzell & Diamond, P.A., Miami, Fla., for defendant Herbert Kornblau; Nathan P. Diamond, Miami, Fla., of counsel.

Goodhart, Rosner & Green, P.A., Miami, Fla., for defendant Sheldon Pett; David Goodhart, Miami, Fla., of counsel.

Kaplan & Katzberg, New York City, for defendant Pett; Robert F. Katzberg, New York City, of counsel.

Joseph Mincberg, West Palm Beach, Fla., for defendant Ferdinando Daniele.

Larry J. Silverman, New York City, for defendant Glenn Joseph Keating.

Gould & Reimer, New York City, for defendant Luis M. Santiago; Norman L. Reimer, New York City, of counsel.

Robert Blossner, New York City, for defendant Charles Montgomery.

Hoffman Pollok & Gasthalter, New York City, for defendant Raymond Dmytrow; Charles L. Weintraub, New York City, of counsel.

Mark Amsterdam, New York City, for defendant Joseph DeCarlo.

Frank Mika, Waynesboro, Va., for defendant Richard Stone.

Russo, Silverman & Vitalliano, New York City, for defendant Steven Lackowitz; Ronald G. Russo, Edward M. Chikofsky, New York City, of counsel.

Jeffrey M. Rubin, New York City, for defendant Arthur Caballero.

Robert Koppelman, New York City, for defendant Alden Belkin.

David M. Ettinger, New York City, for defendant Edward O'Grady.

Lee Richards, New York City, for defendant Ronald Fred Fishman.

Gerald B. Lefcourt, New York City, for defendant Michael Hyman Henry.

Michael Kennedy, New York City, for defendant Michael Haber.

Jerome Laber, Tuscon, Ariz., Ronald Rubinstein, Kew Gardens, N.Y., for defendant Robert Thorud.

R. Jerome Sanford, Miami, Fla., for defendant Virgil Capote.

Bronis & Portela, P.A., Miami, Fla., for defendant Lawrence Haber; Stephen J. Bronis, Miami, Fla., of counsel.

Eric J. Greenbush, New York City, for defendant Roberto Guevedo.

## MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge:

On November 19–20, 1983, nineteen individuals were arrested without warrants in New York City and Port Jervis, New York. In a complaint filed on November 21, 1983, the government alleged that these individuals entered into a conspiracy to violate and did violate 21 U.S.C. §§ 812, 841(a)(1), 841(b)(6) by "unlawfully, intentionally and knowingly attempt[ing] to distribute and possess with intent to distribute in excess of 1,000 pounds of marijuana...." [1] Sev-

---

**1.** On December 1, 1983 an indictment was filed. The government filed a motion for a continuance under the Speedy Trial Act on January 1, 1984 and by Memorandum and Order dated January 26, 1984, the motion was denied. On

March 13, 1984 a superceding indictment was filed adding Raymond Dmytrow as a defendant and deleting from the indictment the names of Roberto Carvajal and Elizabeth Perez who are now deceased. Finally, on April 19, 1984, the

eral motions are now before me. They include (1) motions to suppress evidence and/or post-arrest statements, (2) alternative motions for a hearing on the sufficiency of the search warrants and/or on the issue of probable cause to arrest, and (3) motions for severance.[2]

The facts surrounding the arrest of the defendants, as stated in the complaint, are as follows:

In early November 1983, three undercover agents—U/C 1, U/C 2, and U/C 3—posing as wholesale sellers of marijuana in Austin, Texas entered into negotiations with Roberto Carvajal and defendant Ferdinando Daniele to sell approximately 12,000 pounds of marijuana. Defendant Herbert Kornblau accompanied Carvajal to see a sample of the marijuana. On or about November 14, 1983, Carvajal gave U/C 1 and U/C 2 $250,000 in Austin, Texas. Carvajal told U/C 1 and U/C 2 that they would have to travel to New York City to see the balance of the purchase price. Later, U/C 3 observed defendants Michael Hyman Henry, Roberto Quevedo, and Ronald Fishman in a room in the Marriott Hotel located in Austin, Texas.

On November 15, 1983, U/C 1, U/C 2, Carvajal and Henry flew from Texas to New Jersey and travelled by limosine to New York City where Carvajal checked into room 1129 and Henry checked into room 1127 of the Sheraton Motor Inn. At 10:30 p.m. on November 15th, in room 1130 of the New York Hilton, Carvajal delivered to U/C 1 and U/C 2 $500,000. On November 16, 1983, Carvajal delivered another $250,000 to U/C 1 and U/C 2 at the Sheraton Motor Inn.

U/C 1 and U/C 2 indicated to Carvajal that another 30,000 pounds of marijuana was available for sale. Carvajal stated that he would be interested in the additional delivery. Defendant Sheldon Pett took U/C 1 and U/C 2 in his 1980 Mercedes automobile to an A-frame structure located at the end of a dirt road in the Port Jervis area. Pett indicated to the agents that the A-frame had not been used for a large delivery in six months and that he would have the power turned on in order to operate commercial scales; otherwise, he would obtain a generator to operate the scales. Pett also indicated to U/C 1 and U/C 2 that the dirt road's soil would support an 18-wheel semi-trailer truck. In addition, Pett told the officers that defendant Richard Stone would be one of the drivers and had rented a truck in Texas.

On November 16, 1983 in Austin, Texas, Capote told U/C 3 that the $250,000 previously given to U/C 1 and U/C 2 had come from Capote. Capote and Fishman later introduced U/C 3 to defendant Daniel Thorud as a driver. Further, on November 16th, Capote, Quevedo and Fishman flew to LaGuardia Airport followed the next day by U/C 3.

The purported delivery of the 30,000 pounds of marijuana was scheduled by U/C 1 for November 18, 1983. On November 17, 1983, Carvajal, Pett, U/C 2, and U/C 3 travelled to the Port Jervis A-frame. They then checked into the Port Jervis Holiday Inn. Carvajal told U/C 1 that he could be reached under the name of Richard Stone. On November 18, 1983 U/C 1 told Carvajal that the shipment was about one hour away and Carvajal stated that he was unable to supply the balance of the purchase price. He indicated therefore that he was going to room 4110 of the Parker Meridien Hotel in New York City. Thereafter, negotiations between Carvajal and the undercover agents took place in New York concerning the delivery and payment schedule.

On November 19, 1983, Carvajal, Henry and U/C 3 rented an automobile, dropped Carvajal at the Port Jervis Holiday Inn and drove to the Parker Meridien Hotel in New

government filed a second superceding indictment which among other things added continuing criminal enterprise charges.

**2.** The motion to sever by Raymond Dmytrow will not be discussed or decided herein as it involves an entirely different issue—Dmytrow's health and ability to withstand a twenty-defendant trial. Moreover, it is not yet ripe for determination because he is due to be examined by a second physician.

York City. Capote, Quevedo, and Fishman were in room 4110 when Henry and U/C 3 arrived at the hotel at 2:00 p.m. Thereafter, Henry, Fishman, Capote, and U/C 3 left the hotel and made telephone calls from public telephones on the street. At that point, defendant Michael Haber walked by and Henry called to Haber and spoke to him alone. U/C 3 asked Fishman to identify Haber and Fishman responded that Haber was the one who had the $750,000. At this time DEA agents, including special agent Thomas King, Jr. arrested Capote, Henry, Fishman, and Michael Haber.

In Port Jervis, unaware of the arrests in New York City, Kornblau indicated that he would talk to "his people" to get additional money. U/C 2 went to room 218 of the Holiday Inn where he saw Kornblau and defendant Charles Montgomery. Montgomery had checked into room 218 and according to Kornblau, Montgomery was a driver. Montgomery shared room 218 with defendant Alden Belkin.[3] Montgomery was arrested in his hotel room and Belkin was arrested in the hallway of the hotel.

Kornblau and U/C 2 went to U/C 2's room where Kornblau telephoned defendant Lawrence Haber. Lawrence Haber spoke to U/C 2 and stated that they would not release any additional money until at least 500 to 1,000 pounds of marijuana was loaded on a truck and released to them. Lawrence Haber told Kornblau that he had not heard from and did not know what happened to his brother Michael Haber after the latter went to park his car in New York City.

On November 19, 1983 at 4:00 p.m., four DEA agents transported approximately 15,000 pounds of marijuana to the A-frame. They were followed by Carvajal, U/C 1, and U/C 2. Pett and defendant Glen Joseph Keating were in the A-frame when the others arrived. Carvajal, Kornblau, and U/C 2 left the A-frame after which the "off-loaders" and drivers, defendants Luis M. Santiago, Joseph DeCarlo, Steven Lackowitz, Arthur Caballero, and Stone arrived. Two other undercover agents, Pett, and the drivers and off-loaders went to the motor home parked behind the A-frame where they discussed the marijuana business, how the scales operated and the loading process. Arrests of these individuals who were in the A-frame area followed.

On November 20, 1983 at 2:00 a.m. after he was arrested, Kornblau telephoned Lawrence Haber. Their conversation—the subject of motions to suppress by both Kornblau and Lawrence Haber—were electronically taped by the government. On November 20th at 4:00 a.m., Lawrence Haber was again telephoned in his Parker Meredien Hotel room. He was told by a government agent that his brother was arrested and to go down to the lobby to clear up the situation. Lawrence Haber was arrested in the hotel lobby. Several individuals were searched incident to arrest and various hotel rooms and safe deposit boxes were searched pursuant to warrants.

Motions to suppress post-arrest statements have been made by Montgomery, Kornblau, Belkin, and Pett. Motions to suppress evidence seized pursuant to an allegedly unlawful arrest or an allegedly invalid search warrant have been made by Kornblau, Henry, Belkin, Lawrence Haber, Michael Haber, Fishman, Pett, and Stone. Lawrence Haber and Kornblau move to suppress statements made in a conversation that was electronically recorded. Finally, a motion to sever is made by Montgomery.

## A. Motions to Suppress Statements

█ Defendants Charles Montgomery, Henry Kornblau, Michael Haber, and Shel-

---

**3.** The government indicated in its complaint that Montgomery stated that he was sharing the room with Belkin but that he did not know Belkin. The government now states that actually, Montgomery stated that he was sharing his room with someone whose name he did not know. Thus, the government consents to a probable cause hearing with respect to Belkin's arrest as well as on the issues of the voluntariness of Belkin's post-arrest statements and the government's compliance with *Miranda v. Arizona*. *See* Affidavit of Stephen F. Markstein at 2. Accordingly, a hearing will be conducted on these issues as to defendant Belkin, and the merits of Belkin's motions need not be addressed.

don Pett move to suppress post-arrest statements essentially on two grounds. They argue that their statements should be suppressed as being "tainted" by illegal arrests, *see Wong Sun v. United States*, 371 U.S. 471, 484–86, 83 S.Ct. 407, 415–416, 9 L.Ed.2d 441 (1963), and as being violative of the Fifth and Sixth Amendments.

An officer effecting a warrantless arrest must have "probable cause to believe that an offense has been committed and that the defendant has committed it." *See* Fed. R.Cr.P. 4(a). Probable cause has been defined as a "reasonable ground for belief of guilt." *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–1311, 93 L.Ed. 1879 (1949) (citations omitted). It is less than the quantum of evidence required to obtain a conviction but more than "mere suspicion." *Id.* Probable cause exists when the arresting officer possesses facts and circumstances to warrant a reasonable man to believe that an offense has been or is being committed. *Id.*

■ After an arrest without a warrant is made, a complaint has to be filed and probable cause must be established in the complaint or by way of accompanying affidavits or affirmations. Fed.R.Cr.P. 5(a). The party moving for suppression of statements based on an arrest allegedly made in the absence of probable cause must make a preliminary showing concerning the circumstances of the arrest sufficient to raise a question as to its legality. *See United States v. Rivera*, 321 F.2d 704, 706 n. 1 (2d Cir.1963). The government, however, has the burden of showing that probable cause existed at the time of the arrest. *Id.* at 708 (citing *Wong Sun v. United States*, 371 U.S. at 482, 83 S.Ct. at 414).

1. *Charles Montgomery*

■ Montgomery moves to suppress his post-arrest statement in which he allegedly stated that he was waiting to drive a shipment of marijuana to Connecticut. After his arrest, Kornblau allegedly told agents the same thing. Montgomery argues that his arrest was made in violation of *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), because he was arrested in his hotel room without a warrant and in the absence of exigent circumstances. Thus, he argues, his statement must be suppressed as the "fruit" an illegal arrest. *See Wong Sun v. United States*, 371 U.S. at 484–86, 83 S.Ct. at 415–416.

The Fourth Amendment protects a suspect from warrantless arrests in his or her dwelling unless there are exigent circumstances or an occupant has consented to the entry. *See Payton v. New York*, 445 U.S. at 602–03, 100 S.Ct. at 1388–1389; *United States v. Vasquez*, 638 F.2d 507, 526 (2d Cir.1980), *cert. denied sub. nom, Mesa v. United States*, 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed.2d 620 and 454 U.S. 975, 102 S.Ct. 528, 70 L.Ed.2d 396 (1981). This principle has been extended to a suspect who is arrested in his or her hotel room. *See, e.g., United States v. Whitten*, 706 F.2d 1000, 1015 (9th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984); *United States v. McGuire*, 608 F.2d 1028, 1034 (5th Cir. 1979), *cert. denied*, 444 U.S. 1092, 100 S.Ct. 1060, 62 L.Ed.2d 782 and 446 U.S. 910, 100 S.Ct. 1838, 64 L.Ed.2d 262 (1980); *cf., United States v. Salmasian*, 515 F.Supp. 685, 689 (W.D.N.Y.1981) (because exigent circumstances were found, court assumed but did not decide that individual arrested in his hotel room is entitled to the same protection as an individual arrested in his dwelling).

According to the complaint, the first and only contact that the undercover agents had with Montgomery prior to his arrest was on November 19, 1983, at the Port Jervis Holiday Inn. U/C 2 allegedly saw Kornblau and Montgomery in the same hotel room. After his own arrest, Kornblau allegedly indicated to U/C 2 that Montgomery was involved in the marijuana purchases as a driver. This, however, occurred after Montgomery was arrested and because the test is whether probable cause existed at the time of the arrest, *see United States v. Rivera*, 321 F.2d at 709, Kornblau's statement is of no relevance.

■ Therefore, a hearing is necessary to resolve several factual issues raised by Montgomery's claims. Indeed, no affidavit by the arresting officer was submitted to clarify the circumstances surrounding Montgomery's arrest. Montgomery's presence in the hotel room with Kornblau was the only objective fact before the undercover agent that has been cited to. A defendant's association with an individual suspected of criminal activity is insufficient to constitute probable cause to arrest. *See United States v. DiRe*, 332 U.S. 581, 583–87, 68 S.Ct. 222, 223–225, 92 L.Ed. 210 (1947). Moreover, even assuming that the undercover agents had probable cause to arrest Montgomery, the arrest may have been illegally made in his hotel room. On the other hand, probable cause and exigent circumstances may have justified the agents' warrantless entry into Montgomery's hotel room. Further, Montgomery may have consented to the presence of the agents in his hotel room. The government's submissions do not resolve these issues. Accordingly, Montgomery's motion to suppress his statement is preliminarily denied but his application for a hearing is granted.

### 2. *Herbert Kornblau*

■ Herbert Kornblau moves to suppress "any such statements" that were the "fruit of an illegal seizure of the person of the defendant," or that were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), or that were obtained involuntarily. He submits no memorandum and no affidavits to shed light on the particulars of his claim. Kornblau's submission is wholly inadequate to even raise an issue as to the propriety of his arrest or interrogation and clearly fails to "state sufficient facts which, if proven, would [require] the granting of the relief requested by [Kornblau]." *United States v. Culotta*, 413 F.2d 1343, 1345 (2d Cir.1969). In any event, the undercover agents apparently knew sufficient facts to constitute probable cause to arrest Kornblau. Accordingly, Kornblau's motion to suppress is denied.

### 3. *Michael Haber*

■ Michael Haber moves to suppress the statements that he allegedly made after he was arrested in New York City on November 19, 1983. Haber was arrested near Avenue of the Americas and 56th Street, was searched, and was taken to DEA offices located on 57th Street. At the DEA offices, Haber allegedly stated that he was walking to look at a menu to see if duck was listed and that he was "innocent and [did] not know those guys on the corner." Affidavit of Michael Kennedy, Exh. C. The government alleges that probable cause to arrest Michael Haber was supplied by defendant Fishman's statement to U/C 3 that Haber was "the one with the $750,000" and because Haber was seen talking to defendant Henry after Henry called to Haber.

Haber argues that Fishman never made the statement referred to above and that his presence in the vicinity of the other defendants was insufficient to constitute probable cause. *See United States v. DiRe*, 332 U.S. at 587, 68 S.Ct. at 225. Furthermore, Haber points out that if Fishman did make the alleged statement to U/C 3 the arresting officers still lacked probable cause absent a showing that U/C 3 communicated Fishman's statement to the officers. In response, the government submits the affidavit of the arresting officer Special Agent Thomas King, Jr. King states that after the undercover operation was terminated, King took U/C 3 aside at which point U/C 3 indicated who should be arrested. Haber argues alternatively that assuming Fishman made the statement, it was made only after Haber was arrested by being thrown against a wall and frisked. He argues that Fishman's statement could not play a part in providing probable cause. In response, the government contends that Haber was frisked and detained briefly when a decision was made to terminate the undercover operation but that he was not arrested until after Fishman's statement.

Under the totality of the circumstances, *see Illinois v. Gates*, 462 U.S. 213, 103

S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983), Fishman's statement, if it was actually made, combined with the fact that Henry, who had arrived recently from Texas, called to Haber and that this occurred during the period of time that efforts were being made to obtain the balance of the purchase price, would establish that probable cause existed to arrest Haber. Absent Fishman's statement, however, probable cause would not have existed at the time of Haber's arrest. Thus, a probable cause hearing will be held on the issue of whether and when Fishman made the statement concerning Haber to U/C 3 and whether U/C 3 passed on that information to the arresting officer.

### 4. *Sheldon Pett*

Sheldon Pett moves to suppress statements that he allegedly made after his arrest during questioning conducted by the DEA. Pett allegedly asked the agents whether the government intended to file Racketeer Influenced and Corrupt Organizations Act ("RICO") and Continuing Criminal Enterprise ("CCE") charges against him. Pett also told the agents that he was not as "heavily involved" in the narcotics business as they believed. *See* Affirmation of Robert Katzberg at 2.

Pett argues that his statement was obtained in violation of his Fifth and Sixth Amendment rights. First, he argues that his right to counsel had attached when he was arrested and that his statement should be suppressed because it was made outside the presence of his counsel.

■■■ The Sixth Amendment right to counsel, however, attaches only after adversary proceedings have been initiated. *See Kirby v. Illinois,* 406 U.S. 682, 688, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411 (1972). Pett's right to counsel was not triggered by his pre-indictment arrest because it is not a critical stage of the prosecution. *See United States v. Duvall,* 537 F.2d 15, 20–22 (2d Cir.), *cert. denied,* 426 U.S. 950, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976). Thus,

Pett's right to counsel has not been violated.

■■■ Second, Pett contends that his statements were involuntarily induced by the government agents because they were made after the possibility of cooperation was introduced to Pett. Pett seeks an evidentiary hearing to examine the facts and circumstances surrounding his post-arrest, custodial statements. Suppression motions are not, however, a vehicle to conduct discovery. Pett has a burden of stating facts sufficient, if proven, to justify the award of the requested relief. *United States v. Culotta,* 413 F.2d at 1345. This he has not done. Accordingly, Pett's motion to suppress his post-arrest statements or alternatively for an evidentiary hearing is denied.

### B. Electronic Surveillance Motions by Lawrence Haber and Herbert Kornblau

■■■ Defendants Lawrence Haber and Herbert Kornblau move to suppress evidence obtained through electronic surveillance. On November 20, 1983 at 2:00 a.m., after his arrest, Kornblau telephoned Lawrence Haber at the hotel where Haber was staying. The telephone call was recorded.

The government's position is that the interception of the telephone call was permissible because Kornblau consented to it being recorded. Assistant United States Attorney Stephen F. Markstein states in his affidavit that he was informed by DEA agents that Kornblau had agreed initially to cooperate and that a DEA Form 6 was completed to reflect that. Yet, the government's opposition papers do not include any affidavits by the DEA agents or a copy of the DEA Form 6. Accordingly, a hearing will be held on the motions made by Lawrence Haber and Kornblau to suppress the tape recording.

### C. Motions to Suppress Seized Evidence

Defendants Henry, Fishman, Lawrence Haber, Michael Haber, and Pett[4] move to

---

**4.** Charles Montgomery and Richard Stone join in all motions made by other defendants insofar

suppress evidence that was either seized pursuant to arrest or pursuant to search warrants authorizing the search of hotel rooms and safe deposit boxes.[5] I will discuss first the principles that govern searches made incident to arrest and searches made pursuant to a warrant.

A magistrate may issue a search warrant upon a finding that (1) a crime was committed and, (2) that there is probable cause to believe that evidence of such crime is located in the place to be searched. The standard for the review of such a determination made by a magistrate is limited; a magistrate's finding of probable cause is entitled to "substantial deference." *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir.1983). Indeed, in close cases, doubts are to be resolved in favor of upholding the warrant. *Id.* The question before me, then, is whether the magistrate who issued the challenged warrants performed their functions in a neutral and detached manner on the facts before them or whether they merely acted as rubber stamps for the conclusions drawn by the police. *Id.* Based on a review of the affidavits (including the complaint) that were before the magistrates and of the warrants themselves, I find as to all of the defendants that the magistrates acted impartially and that their findings of probable cause were justified under the totality of the circumstances. I will discuss each defendant and his claims in turn.

### 1. *Michael Henry*

Henry seeks the suppression of the property taken from his hotel room (room 1127) at the Sheraton Motor Inn in New York City on the ground that the warrant issued by Magistrate Raby was not based on a finding of probable cause to believe that the room contained contraband. As will be discussed in the following section, Fishman raises the same issue.

The government attacks the standing of defendants Henry and Fishman. The Fourth Amendment rights of Henry and Fishman have to be implicated in order for them to reap the benefit of the exclusionary rule. *United States v. Salvucci*, 448 U.S. 83, 87, 100 S.Ct. 2547, 2550, 65 L.Ed.2d 619 (1980). An illegal search only violates the rights of one who has a legitimate expectation of privacy in the invaded place. *Id.; Rakas v. Illinois*, 439 U.S. 128, 140, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978). The "occupants of a hotel room are entitled to the protection of the Fourth Amendment ... [b]ut the reasonableness of an individual's privacy expectations appropriately may be considered in the context of a 'place.' " *United States v. Agapito*, 620 F.2d 324, 331 (2d Cir.), *cert. denied*, 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980).

Thus, Henry clearly had an expectation of privacy in his hotel room and may challenge the sufficiency of the warrant to search room 1127. Contrary to the government's suggestion, no personal affidavit is required to establish such an interest. This is especially true in light of paragraph 2(d) of the complaint in which the government concedes that upon his arrival in New York, Henry "took room 1127." In any event, Henry submitted with his reply memorandum an affidavit in which he sets forth sufficient facts to indicate that he had a legitimate expectation of privacy in his hotel room and the baggage within the hotel room.

as they are applicable to them. Unless otherwise indicated, I have not found that the motions filed by the other defendants apply to Montgomery and Stone. Alden Belkin moved to suppress physical evidence that was seized from his hotel room on the basis that his arrest was not based on probable cause. As already discussed, the government has consented to a probable cause hearing at which time the facts surrounding his warrantless arrest will be explored.

**5.** The government urges the adoption of the good faith exception to the exclusionary rule in upholding the search warrants. *See United States v. Williams*, 622 F.2d 830, 848 (5th Cir. 1980) (en banc), *cert. denied*, 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981). I decline the government's invitation.

■ Special Agent Larry Lamberson's affidavit in support of an application for a warrant to search rooms 1127 and 1129 of the Sheraton Motor Inn, New York City stated that Carvajal and Henry were staying in room 1127 and 1129 during the negotiations for the sale of the marijuana. Henry argues that the complaint attached to Lamberson's affidavit focused on Carvajal who had given $250,000 to undercover agents in the Sheraton and that Carvajal had moved to the Parker Meridien Hotel on November 17, 1983. Thus, Henry contends that there was no probable cause to believe Henry's rooms contained cash, especially because it was never suggested that Henry supplied or would supply cash to the agents. Further, Henry states that the warrant was directed at both room 1127 and room 1129 and that Carvajal stayed only in room 1129.

The facts recited in Lamberson's affidavit and in the complaint which was attached to the affidavit, however, support the magistrate's finding of probable cause. The complaint states that Henry was present in Austin, Texas during the initial negotiations between Carvajal and the undercover agents, Complaint ¶ 2(c), and that Carvajal and Henry flew to New Jersey with U/C 1 and U/C 2, *id.* ¶ 2(d). The complaint states that later in Port Jervis, U/C 3 and Henry rented a car, dropped Carvajal at the Holiday Inn and drove to New York's Parker Meridien Hotel. *Id.* ¶ 2(n)(*o*). On November 16, 1983, $250,000 was transferred to undercover agents by Carvajal at the Sheraton in the lobby. Further, in his affidavit, Lamberson cited his experience with the DEA as a factor contributing to his belief that large amounts of cash would be found in the rooms. He stated that he believed also that telephone records, plane ticket receipts, and other documents that related to travel and the drug trade would be in the hotel rooms.

Thus, the complaint and affidavit demonstrate that the three undercover agents had sufficient contact with Henry in Texas and New York to support a belief that Henry's room would contain the items sought. The magistrate therefore had suf-ficient facts before him to conclude that there was probable cause to believe that cash, telephone records, other records relating to drug trafficking, plane ticket receipts, and travel records would be in rooms 1127 and 1129 of the Sheraton Motor Inn. Henry's motion to suppress the evidence seized from the Sheraton is denied and no hearing is required under the circumstances.

### 2. *Ronald Fishman*

■ Like Henry, Ronald Fishman moves to suppress all documents and materials seized during a search of rooms 1127 and 1129 of the Sheraton Motor Inn.

As stated in the discussion of Henry's motion, Henry and Carvajal checked into rooms 1127 and 1129 respectively. Fishman, however, allegedly stayed in room 1129 from approximately November 16, 1983 through November 19, 1983. Apparently, Fishman left his belongings in room 1129 but had access to both rooms by a pass card. *See* Affidavit of Ronald Fishman. Thus, although Fishman did not formally check into one of the two Sheraton Hotel rooms that were searched, he still had an expectation of privacy in room 1129. *See United States v. Salvucci*, 448 U.S. at 87, 100 S.Ct. at 2550 (test is not one of possessory interest).

Like Henry, Fishman argues that all of the discussions concerning the purchase price money were with Carvajal and not Fishman and that none of those discussions indicated that a large sum of cash would be present in a hotel room at the Sheraton. Carvajal had moved to the Parker Meredien Hotel and all discussions were instructed to be held there. Nevertheless, for the reasons stated under the prior section rejecting Henry's argument, Fishman's argument is also rejected.

■ Fishman's second argument is that the search warrant was overbroad because it failed to particularize adequately the items being sought. The warrant listed: "cash, telephone records, other records relating to drug trafficking, plane ticket re-

ceipts, other travel records, and other evidence, fruits, and instrumentalities of the crime of narcotics conspiracy in violation of 21 U.S.C. § 846." Affidavit of Lee S. Richards, Exh. C. I find that this language is sufficiently particular and is effectively narrowed by the fact that the items were sought in connection with a "narcotics conspiracy." *See Andresen v. Maryland*, 427 U.S. 463, 480–81, 96 S.Ct. 2737, 2748–2749, 49 L.Ed.2d 627 (1976).

### 3. *Lawrence Haber*

■ Lawrence Haber seeks the suppression of the items seized pursuant to his arrest on the ground that there was no probable cause to believe he had committed a crime. Further, Haber argues that even assuming there was probable cause, his arrest was made in a public place—the hotel lobby—by means of "trickery, deceit and coercion." Haber was arrested after he left his hotel room and went to the lobby in response to a telephone call in which an agent informed him that his brother Michael Haber had been arrested and asked him to go to the lobby to "clear up the situation."

In its complaint, the government first mentions Lawrence Haber in connection with a telephone call made on November 19, 1983 by Kornblau and U/C 2 to someone named "Larry." Complaint ¶ 2(q). Larry stated to U/C 2 that no additional money would be released until they saw the marijuana. Kornblau then allegedly told U/C 2 that "Larry" was Lawrence Haber. Lawrence Haber also allegedly told Kornblau who in turn told U/C 2 that he did not know what happened to his brother Michael. A second telephone call was made by Kornblau to Lawrence Haber at 2:00 a.m. on November 20, 1983 after Kornblau had been arrested. As already discussed, the second telephone conversation which was recorded is the subject of the motions to suppress and a hearing will be held on the issue of whether Kornblau actually agreed to cooperate with the DEA agents subsequent to his arrest.

Additionally, it may be essential to a finding of probable cause that Kornblau did identify "Larry" as Lawrence Haber. This issue will also be explored at the hearing. Absent the second telephone conversation and absent Kornblau's identification of "Larry" as Lawrence Haber, U/C 2 only knew that someone named "Larry" stated that he would not release more money until he saw marijuana. Apparently relying on the complaint which includes Special Agent McDonald's affidavit, the government does not even submit an affidavit by U/C 2 or the arresting officer setting forth the factors that would constitute probable cause to believe Lawrence Haber had committed or was committing a crime. Accordingly, the legality of Lawrence Haber's arrest will be explored at an evidentiary hearing.

Assuming *arguendo* that the evidentiary hearing results in a finding that there was probable cause to arrest him, Haber argues alternatively that his arrest is nevertheless illegal because he was tricked into going to a public place where he was arrested. Haber's contention is frivolous. First, I fail to see how any ruse or trick was utilized to get Haber to the lobby. The government agent informed Haber of a fact—that his brother had been arrested. Second, even if the agent's statement could be viewed as deceptive, it does not rise to the level of a due process violation. *Cf. United States v. Reed*, 639 F.2d 896, 902 (2d Cir.1981) (abduction from another country to effect arrest pursuant to valid warrant does not violate defendant's due process rights or constitute an unreasonable seizure).

### 4. *Michael Haber*

Michael Haber moves to suppress the items that were seized when he was arrested on November 19, 1983 in New York City on the ground that no probable cause existed to arrest him. He also seeks to suppress the evidence resulting from the search of his safe deposit box at Leumi Bank.[6] As already stated in my discussion

---

**6.** Michael Haber seeks the return of a carton of    blank videotapes and a bag of dirty laundry that

of the post-arrest statements made by Haber, a probable cause hearing will be held regarding Michael Haber's arrest. After the hearing, a determination will be made as to the suppression of both the physical evidence that was seized incident to his arrest and of the testimonial evidence.

As to the search of his safe deposit box, Michael Haber argues that the government discovered his safe deposit box through his credit cards that were seized pursuant to his arrest. Thus, the legality of Haber's arrest may determine the admissibility of the safe deposit box evidence.

Haber's second argument pertaining to the search of his safe deposit box is that the affidavit in support of the application for a warrant was defective. If Haber's arrest is upheld as being based on probable cause, the search of the safe deposit box is still subject to attack on the basis of the sufficiency of the warrant. Michael Haber argues that Special Agent Silvestri's affidavit was inaccurate as it states: "[a]s set forth in the complaint, Michael Haber was allegedly in possession of $750,000 in cash to be paid in connection with the drug purchase." Affidavit of Michael Kennedy, Exh. D. (Affidavit of William Silvestri, ¶ 3); *see id.* ¶ 5. The arresting officers did not find $750,000 on Michael Haber when he was arrested.

The facts as alleged by Agent Silvestri to show that probable cause existed to believe that Haber's safe deposit box contained the items sought are interwoven with the issues to be resolved at the probable cause hearing. Specifically, there might not have been probable cause to believe Haber's safe deposit box contained the items sought if Fishman never identified Haber as the one with the $750,000. Second, the

government concedes that the credit cards seized pursuant to Haber's arrest led to the discovery of the safe deposit box. Thus, if the arrest is invalidated for lack of probable cause, then the fruits of the arrest will be suppressed. Accordingly, a determination of Michael Haber's motion to suppress the evidence obtained from the search of his safe deposit box will be postponed pending the hearing.[7]

### 5. *Sheldon Pett*

■ Sheldon Pett challenges the search of five safe deposit boxes and two apartments. Four separate applications for search warrants are involved.

#### (a) Apartment 63

Apartment 63 at 111–45 76th Avenue in Forest Hills, New York ("apartment 63") was searched pursuant to Magistrate Scheindlin's telephonic approval. An affidavit by Special Agent Larry Lamberson was read to the magistrate. Lamberson stated in his affidavit that Pett had told him and other agents that he had an "apartment" in New York and a "residence" on Long Island. Lamberson stated that apartment 63 was located after checking with the Department of Motor Vehicles. The information was confirmed by the telephone company and a visit to the apartment which revealed Pett's name on the doorbells.

Pett allegedly told Lamberson that he had approximately 160 ounces of gold in his "house." Further, Lamberson stated that Pett told him that he had once taken a large package of marijuana and stored it in his apartment. He also told Lamberson

---

were taken from his Mercedes. Neither the videotapes nor the laundry were inventoried. The government disavows any knowledge of the seizure of the Mercedes, the dirty laundry or blank videotapes. *See* Affidavit of Stephen F. Markstein, ¶ 10.

**7.** If Michael Haber's arrest is upheld and I find that Haber was identified by Fishman as the one with the $750,000, there would have been probable cause to search Haber's safe deposit box. Indeed, the inaccuracy in Silvestri's affida-

vit may have been corrected by the incorporation of the complaint in the affidavit. Further, the fact that $750,000 was not recovered from Haber does not necessarily mean that the agents did not have probable cause to believe that the safe deposit box contained "cash, securities, records of narcotics transactions ...," etc. Finally, the fact that Haber visited the safe deposit box after being released on bail would appear to indicate that the box was still being used.

that he kept an "Uzi" machine gun in his New York apartment. Thus, Lamberson, citing his twelve years of experience with DEA, stated that there was probable cause to believe that gold, cash, telephone records, marijuana, and firearms would be found in Pett's apartment.

Pett argues that the information recited to the magistrate was misleading because the government failed to tell her that Pett owned a "house" in Florida and that Pett had assertedly referred to a "house" and not an apartment. The fact that Pett owns a house in Florida is immaterial to the house-apartment discrepancy as all of Pett's statements appeared to relate to New York. Moreover, it appears from the transcript of the telephonic application for a search warrant that Magistrate Scheindlin considered the apparent discrepancy between "house" and "apartment" and concluded that the word house could be used in the generic sense as meaning any place where he resides. Because I find that the magistrate performed her duties in an impartial manner, her conclusion on this issue is entitled to substantial deference. *See United States v. Travisano*, 724 F.2d at 345.

Magistrate Scheindlin also considered the discrepancy between Pett's statement that he had a residence on Long Island and that the requested warrant was for an apartment in Forest Hills. The transcript indicates also that the magistrate was apparently satisfied that Pett had been referring to his Forest Hills apartment based on the fact that the government had checked and found no other residence for Pett on Long Island.

Citing *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1958), Pett argues that the government had a duty to disclose to the magistrate that Pett disavowed earlier statements that he had made to DEA agents on November 19th concerning certain property. Pett allegedly told the undercover agent that "the property I listed is not real property and I don't think you believe that was property I own." Pett, however, has failed to allege "deliber-ate falsehood or ... reckless disregard for the truth." *Id.* at 171, 98 S.Ct. at 2684. Further, Pett has not submitted any proof on the matter, *id.*, and has not indicated how the alleged omission falls within the ambit of *Franks v. Delaware*. Finally, assuming the affidavit was incomplete, the warrant can still be sustained because if the affidavit included Pett's disavowal of his earlier statement it nevertheless recites facts sufficient to constitute probable cause. *Id.* at 172 n. 8, 98 S.Ct. at 2684 n. 8.

Pett also argues that the warrant was overbroad. For the reasons stated in my discussion concerning the same argument raised by Fishman, Pett's argument is rejected. *See Andresen v. Maryland*, 427 U.S. at 480–81, 96 S.Ct. at 2748–2749.

(b) Apartment 10–F

Pett's apartment located at 265 East 66th Street, New York, New York ("apartment 10–F") was searched pursuant to a warrant issued by Magistrate Harold Raby upon an affidavit by Special Agent Lamberson. Lamberson stated that while driving in a car with Pett during the undercover operation, Pett pointed to a building located in the east sixties and indicated that he had an apartment there. An inquiry with the telephone company revealed that Pett had an unlisted number at the apartment. Lamberson cited similar information that he cited for apartment 63 including Pett's statements concerning the bales of marijuana, machine gun, and the gold. For the reasons stated in support of upholding the warrant to search apartment 63, the warrant to search apartment 10–F is also upheld.

(c) Safe Deposit Boxes

Two safe deposit boxes in Pett's name located at Chemical Bank on Second Avenue in New York City and three safe deposit boxes at a Chemical Bank in Forest Hills were searched pursuant to warrants issued by magistrates upon the affidavits of Special Agents McDonald and Calderon. Pett challenges the search on the ground that the boxes were discovered through

receipts found in apartment 10–F. I have stated already that Magistrate Raby properly found that there existed probable cause to believe that the items listed in the warrant would be found at apartment 10–F. Accordingly, the search of the Chemical Bank safe deposit boxes was justified.

Accordingly, defendant Pett's motion to suppress the evidence seized during the searches of his apartments and five safe deposit boxes is denied and no hearing will be held.

### D. Motion to Sever

Montgomery seeks to be severed from the trial of his codefendants on the ground that his alleged participation—acting as a driver—in the activities culminating in the arrest of twenty-one defendants was "peripheral" to the conspiracy. Thus, he argues that he will be subject to "prejudicial spillover of a volume of testimony involving the co-defendants and having nothing to do with him." Affidavit of Robert Blossner, at 5; *see* Fed.R.Cr.P. 14.

Ordinarily, individuals accused in an indictment of joint participation in a crime can be tried together. *See United States v. Lord*, 565 F.2d 831, 839 (2d Cir. 1977). A defendant seeking severance has the burden of establishing substantial prejudice. *Id.* Montgomery is charged in the second superceding indictment, SS 83 Cr. 756 (KTD), with conspiracy to violate the federal narcotics laws. His alleged participation may in fact be more limited than that of other defendants but the facts are not complex and a jury should not have difficulty in considering the evidence against Montgomery without any spillover effect.

Furthermore, Montgomery seeks severance on the ground that he wishes to have Kornblau testify on his behalf. Montgomery, however, has not shown that his co-defendant, Kornblau, would testify at a severed trial and waive his privilege against self-incrimination. *United States v. Lyles*, 593 F.2d 182, 192 (2d Cir.), *cert. denied*, 440 U.S. 972, 975, 99 S.Ct. 1537,

1545, 59 L.Ed.2d 789, 794 and 444 U.S. 847, 100 S.Ct. 94, 62 L.Ed.2d 61 (1979). Accordingly, Montgomery's motion for severance is denied.

### E. Summary

The motions by Pett and Kornblau to suppress post-arrest statements are denied without a hearing. The motions by Henry, Fishman and Pett to suppress seized evidence are denied in all respects. An evidentiary hearing will be held on the following issues: (1) whether Montgomery's arrest was based on probable cause and whether the arrest was properly effected in his hotel room; (2) whether the electronic surveillance of the conversation between Kornblau and Lawrence Haber was legal; (3) if the electronic surveillance is found to have been illegal and is suppressed, whether there was sufficient probable cause in any case to arrest Lawrence Haber; and (4) whether there was probable cause to arrest Michael Haber. The defendants will be arraigned on the second superceding indictment on May 17, 1984 at 9:30 a.m. At that time the probable cause hearings will be scheduled.

SO ORDERED.